## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CIVIL ACTION NO.

MONIQUE MICHEL, individually and on behalf
of all others similarly situated,

      Plaintiff,

vs.

RESTAURANT BRANDS INTERNATIONAL,
INC., BURGER KING WORLDWIDE, INC.,
and BURGER KING CORPORATION,

      Defendants.

JURY TRIAL DEMANDED

CLASS ACTION COMPLAINT

## COMPLAINT

Adam Smith, in the *Wealth of Nations*, wrote: "We rarely hear, it has been said, of the combinations of masters, though frequently of those of workmen.  But whoever imagines, upon this account, that masters rarely combine, is as ignorant of the world as of the subject.  Masters are always and everywhere in a sort of tacit, but constant and uniform, combination, not to raise the wages of labour above their actual rate."[1]  One form of employer combination that is particularly harmful to workers is the "no-poach" agreement, in which a group of employers agree that they will not hire or solicit one another's workers.  These are often contained in franchise agreements, requiring the individual franchises to agree not to hire or solicit workers from other franchises of the same brand.  Princeton University economists Alan Krueger and Orley Ashenfelter have studied franchise agreements extensively, and they conclude that "[a]greements to refrain from recruiting and hiring away employees from other units in a franchise chain are common in franchise contracts," that those

_____

[1] ADAM SMITH, AN INQUIRY INTO THE NATURE AND CAUSES OF THE WEALTH OF NATIONS (1776), https://www.gutenberg.org/files/3300/3300-h/3300-h.htm.

no-poaching agreements can limit turnover, reduce labor market competition, and reduce workers' job opportunities, and that the prevalence of no-poaching agreements may help to explain why wage growth has been sluggish despite low unemployment.[2]

Plaintiff Monique Michel is a Burger King employee who brings this class action on behalf of herself and the proposed class (defined below) of all other similarly-situated current and former Burger King employees against Defendants Restaurant Brands International, Inc. ("RBI"), Burger King Worldwide, Inc. ("BKW"), and Burger King Corporation ("BKC") (together, "Defendants" or "Burger King") for Burger King's anticompetitive clause in its franchise agreement that prevents any Burger King franchise from hiring or soliciting current employees of other Burger King franchises or former employees who have worked for any Burger King franchise in the past six months (the "No-Poach Clause").  Plaintiff alleges that this no-hiring and no-solicitation agreement is an illegal conspiracy between Defendants and Burger King franchises in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 and seeks treble damages and injunctive relief, demanding a trial by jury of all issues so triable.  The allegations contained in this Complaint are based on Plaintiff's personal knowledge as to Plaintiff's own conduct and upon information and belief or based on the investigation of counsel as to all other matters:

## I.    INTRODUCTION

1.    Burger King required all franchisees to sign a franchise agreement that included a clause stating that they would not hire or solicit any workers employed at another Burger King franchise or owned by the BKC, both during their employment and for six months after the termination of their employment.  This no-hire/no-solicitation agreement is *per se* illegal under the

---

[2] Alan B. Krueger and Orley Ashenfelter, *Theory and Evidence on Employer Collusion in the Franchise Sector*, NATIONAL BUREAU OF ECONOMIC RESEARCH (July 2018), at 20-1.

federal antitrust laws.

2.      Burger King is America's fourth-largest fast-food chain by sales and sixth-largest by number of restaurants, with about 7,000 restaurants in the United States and annual U.S. sales of approximately $10 billion.[3]  The Burger King Corporation, BKC, owns only about 50 restaurants, all in the Miami area; the rest are all owned and operated by franchisees.

3.      Burger King receives profits from its franchises in several ways: franchise fees, rent for properties leased from Burger King, and a sales royalty paid on gross sales.  Since over 99% of Burger King restaurants are owned by franchisees, these represent almost the entirety of Burger King's profits.  Opening a new Burger King franchise costs from approximately $300,000 to $3 million, with the variation primarily depending on the cost of the real estate and what construction is necessary.

4.      Burger King's franchise agreement, which franchisees are required to sign, included the following "no-hire" clause or a functionally identical clause from at least 2010 through at least August 12, 2018 (the No-Poach Clause):

> Neither BKC nor Franchisee will attempt, directly or indirectly, to entice or induce, or attempt to entice or induce any employee of the other or of another Franchisee of BKC to leave such employment, or employ such employee within six (6) months after his or her termination of employment with such employer, except with the prior written consent of such employer.

5.      Since Burger King's franchise agreements were standardized, and franchisees knew that the franchise agreements were standardized, each franchisee knew that other franchisees were subject to the same franchise agreement and subject to the same No-Poach Clause.

6.      The No-Poach Clause explicitly includes BKC, and restaurants owned and operated

---

[3] *The QSR 50*, QSR MAGAZINE, https://www.qsrmagazine.com/content/qsr50-2018-top-50-chart?sort=total_units_in_2017_index&dir=desc (last visited October 14, 2018).

directly by BKC are also subject to the No-Poach Clause.

7.      Since the No-Poach Clause was contained in the franchise agreement with BKC that was mandatory for franchisees to sign, it was a collusive policy between BKC and its franchises that allowed the franchises to reduce turnover and suppress wages, making franchises more profitable, and thereby encouraging additional franchises, which increased the franchise fees, property rents, and sales royalties received by BKC.

8.      The franchise agreement also gave BKC the right to terminate franchisees' rights to operate their franchises in the event that they violated the agreement, including the No-Poach Clause. This meant that franchisees were compelled to follow the No-Poach Clause.

9.      The No-Poach Clause is an unreasonable restraint of trade that is a *per se* violation of the Sherman Act, Section 1, 15 U.S.C. § 1.  The Department of Justice's Antitrust Division and the Federal Trade Commission cooperated on the publication of *Antitrust Guidance for Human Resource Professionals*, which states: "[n]aked wage-fixing or no-poaching agreements among employers, whether entered into directly or through a third-party intermediary, are *per se* illegal under the antitrust laws."[4] This document also states that "firms that compete to hire or retain employees are competitors in the employment marketplace…[i]t is unlawful for competitors to expressly or implicitly agree not to compete with one another, even if they are motivated by a desire to reduce costs."[5]  This definition of an illegal no-poach agreement covers the No-Poach Clause between different Burger King franchises.

10.     The No-Poach Clause and similar agreements reduce competition for employees, which has the resulting effect of reducing turnover, employee choice, mobility, and wages.  This

---

[4] U.S. DEPT. OF JUSTICE, *Antitrust Guidance for Human Resource Professionals* (Oct. 2016), https://www.justice.gov/atr/file/903511/download, at 3.
[5] *Id*, at 2.

reduces employees' bargaining power both with their current employer and with other potential employers subject to the same No-Poach Clause.  In the fast-food industry, an employee's skills are considered to be primarily employer-specific, and do not easily transfer to other fast food franchises or other types of restaurants, making the No-Poach Clause and similar agreements especially harmful to employees in that industry.

11.    The purposes of the No-Poach Clause are to reduce turnover and suppress Burger King's employees' wages by eliminating competition between Burger King franchises for workers. Without a No-Poach Clause, franchises would raise wages to attract each other's workers, franchises would often have to raise wages and improve conditions to keep their own workers from seeking to work for other franchises, and a worker at one franchise could seek higher-paid or higher-level positions at other franchises in her area.  The No-Poach Clause greatly reduced or eliminated all of those possibilities and resulted in reducing turnover, employees' wages, benefits, working conditions, job mobility, and job choice versus what they would have been in an open market, benefitting franchises, and by extension, Burger King, at the expense of Burger King employees.

12.    Plaintiff and members of the Class are current and former Burger King employees, who allege that Burger King's imposition of the No-Poach Clause, and collusion with its franchisees to implement and enforce it, proximately and foreseeably caused Plaintiff and other Class members to experience suppressed wages, worse benefits and working conditions, and reduced choice and mobility as to work location.

13.    Since the No-Poach Clause is part of Burger King's franchise agreement and is not mentioned in Burger King's or its franchises' employee agreements or other employee materials, Burger King restaurant employees are not made aware of the No-Poach Clause.  For Burger King to deny Burger King restaurant employees the knowledge that the No-Poach Clause was operational

was fraudulent concealment, and it withheld information that would have been material to their decision on whether to accept a position with a Burger King franchise at the time of hiring, had they known that the No-Poach Clause would have a significant negative effect on their wages, benefits, working conditions, upward mobility, and choice of locations at which to work.

14.     The Washington (state) Attorney General's office began an investigation of fast-food no-poach clauses starting in January 2018, which included Burger King.  The Washington Attorney General's office considered the No-Poach Clause and similar clauses imposed by other fast-food and restaurant chains on their own workers to be illegal and a violation of Washington's antitrust laws, stating: "No-poach provisions create a rigged system where businesses no longer have to compete for workers, putting downward pressure on wages nationwide.  That's wrong – and illegal."[6]

15.     After the investigation found that Burger King had used the No-Poach Clause, on or around August 12, 2018, BKC entered into an agreement with the State of Washington under which it agreed that it would not include the No-Poach Clause in franchise agreements with new franchisees, it will not enforce the No-Poach Clause against any existing franchise, and it will not include the No-Poach Clause in franchise agreements with existing franchisees that are renewed.[7]

16.     On information and belief, many of Burger King's franchisees are not aware that the No-Poach Clause is being removed from the franchise agreement and that it will no longer be enforced by Burger King.  Therefore, even though BKC has agreed to stop using and enforcing the No-Poach Clause, it still has negative effects, and injunctive relief is necessary to prevent continuing

---

[6] *AG Ferguson Secures End to No-Poach Provisions at Eight More Restaurant Chains Nationwide*, WASHINGTON STATE OFFICE OF THE ATTORNEY GENERAL (Sept. 13, 2018), https://www.atg.wa.gov/news/news-releases/ag-ferguson-secures-end-no-poach-provisions-eight-more-restaurant-chains.

[7] Burger King Corporation Assurance of Discontinuation, *In re: Franchise No Poaching Provisions*, No. 18-2-22877-8SEA (Wash. Super. Ct. Sept. 13, 2018).

harm.

17.     Defendants' anticompetitive actions in imposing the No-Poach Clause on Burger King franchises and colluding with Burger King franchises to enforce it has damaged Plaintiff and members of the Class.  Plaintiff seeks treble damages, injunctive relief, and reasonable attorneys' fees and litigation costs on behalf of herself and the Class under the Sherman Antitrust Act, Section 1, 15 U.S.C. § 1.

## II.     JURISDICTION AND VENUE

18.     Plaintiff brings her claim under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, seeking treble damages pursuant to Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15 and injunctive relief pursuant to Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.  This Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1337(a).

19.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) and 15 U.S.C. §§ 15 and 22, as Defendants reside, transact business, committed an illegal or tortious act, have agents, and/or can be found in this District.  BKW and BKC's corporate headquarters are located in this District, and on information and belief, the approximately 50 restaurants that BKC still directly owns are all located in this District.

20.     This Court has personal jurisdiction over Defendants pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22.  This Court has specific and general jurisdiction over BKW and BKC because they are headquartered in this District, transact business in this District, and committed overt acts in furtherance of their conspiracy in this District.  This Court has personal jurisdiction over RBI because it has extensive operations in this District through BKW and BKC, transacts business in this District through BKW and BKC, and committed overt acts in furtherance of its conspiracy in this District.

21.     Further, Defendants' anticompetitive actions were directed at the United States, including in the Southern District of Florida, and were intended to cause and did cause injury to persons in the United States, including in the Southern District of Florida, and Plaintiff's claims arose from Defendants' anticompetitive actions.

### III.     INTERSTATE COMMERCE.

22.     Burger King franchises restaurants in all 50 states, and those franchises hire workers in all 50 states.

23.     Burger King's employment policies have a national effect as a result of the national reach of its franchises.

24.     In metropolitan areas that cross multiple states, such as New York (NY/NJ/CT), Chicago (IL/IN/WI), Washington D.C. (DC/MD/VA), Philadelphia (PA/NJ/DE), and Cincinnati (OH/KY/IN), the No-Poach Clause greatly reduced the ability of Burger King restaurant employees to obtain higher paying or otherwise more desirable positions with another Burger King franchise in a different part of the metropolitan area, including across a state line.  For example, a Burger King in Cherry Hill, NJ could not attempt to recruit Burger King employees from nearby Philadelphia, PA by offering them higher salaries.

25.     As a result of the above, Burger King's anticompetitive actions had a substantial effect on interstate trade and commerce in the employment market for Burger King restaurant employees.

### IV.     PARTIES

**A.     Plaintiff.**

26.     Plaintiff Monique Michel is a resident of Philadelphia, PA who worked for a Burger King franchise during the Class Period (defined below).  Defendants' anticompetitive conduct through imposing the No-Poach Clause on their franchises and enforcing it in collusion with their

8

franchises caused Plaintiff and other Class members to experience suppressed wages and benefits and reduced choice of franchises and work options within them.

### B.   Defendants.

27.   Defendant Restaurant Brands International, Inc. (RBI) is an Ontario corporation based in Oakville, Ontario, Canada.  Restaurant Brands International owns the Burger King brand through its subsidiaries Burger King Worldwide, Inc. and Burger King Corporation, and also owns the brands Tim Hortons and Popeye's.

28.   Defendant Burger King Worldwide, Inc. (BKW) is a Delaware corporation based in Miami, Florida, and is a subsidiary of Restaurant Brands International, Inc.

29.   Defendant Burger King Corporation (BKC) is a Florida corporation based in Miami, Florida, and is a subsidiary of Burger King Worldwide, Inc.  BKC handles the day-to-day management of the Burger King brand and its franchise relationships in the United States, and also owns and operates approximately 50 Burger King restaurants in the Miami area.

30.   BKC's imposition of, and enforcement of, the No-Poach Clause, was done under the knowledge, authority, and assent of RBI and BKW.

### C.   Unnamed Co-Conspirators.

31.   Burger King franchises and their owners are participants as co-conspirators in Burger King's anticompetitive actions through their cooperation in the enforcement of the No-Poach Clause, and the franchise owners agreed to participate in those anticompetitive actions when they signed the franchise agreement containing the No-Poach Clause.  The franchises and their owners have taken actions in furtherance of the No-Poach Clause and thereby conspired with Burger King to suppress the wages of Burger King restaurant employees and raise the profitability of Burger King franchises, and by extension, Burger King.  Defendants are jointly and severally liable for anticompetitive

9

actions taken by their non-Defendant co-conspirators.

## V.    STATEMENT OF FACTS

32.    Burger King is America's fourth-largest fast-food chain by sales and sixth-largest by number of restaurants, with about 7,000 restaurants in the United States and annual U.S. sales of approximately $10 billion.  The Burger King Corporation, BKC, owns only about 50 restaurants, all in the Miami area; the rest are all owned and operated by franchisees.

33.    Burger King receives profits from its franchises in several ways: franchise fees, rent for properties leased from Burger King, and a sales royalty paid on gross sales.  Since over 99% of Burger King restaurants are owned by franchisees, this represents almost the entirety of Burger King's profits.  Opening a new Burger King franchise costs from approximately $300,000 to $3 million, with the variation primarily depending on the cost of the real estate and what construction is necessary.

34.    Burger King franchises compete with one another and also compete with the 50 or so restaurants owned directly by BKC.  Burger King tells its franchisees in the franchise agreement that: (1) "[o]ther BURGER KING Restaurants may compete with your Restaurant"; (2) Burger King franchisees do not receive an exclusive territory; and (3) franchisees "may face competition from other franchisees, from outlets that we own, or from other channels of distribution or competitive brands that we control."

35.    Burger King's franchise agreement sets forth that each Burger King franchise is independently owned and operated, and that it is classified as an independent contractor and a different legal entity from Burger King.  Franchisees all agree that they are "not an agent, partner, joint venturer, joint employer or employee of BKC."

36.     The franchise agreement sets forth that the franchisees are solely responsible for the hiring, firing, promotion, and discipline of their employees, and establish their own wages, hours, benefit policies, and other employment rules—with the exception of the No-Poach Clause.

37.     Fast-food workers are "among the lowest paid employees in the U.S." and fast-food cooks earn an average of $ 9.07 per hour.[8]  While 59% of the overall U.S. workforce receive health benefits through their employers, only 13% of fast-food workers do.[9]  Fast-food workers' workplace injury rates are higher than average, because of safety hazards including hot ovens and slippery floors.[10]  Half of American fast-food workers rely on some form of public assistance.[11]

38.     According to one estimate, average salaries at Burger King franchises are $8.78 for a crew member, $10.15 for a shift manager, and $10.66 for an assistant manager.[12]

39.     While Burger King does not set the pay scale for its franchises, and it allows franchises to set their own wages and employment policies, these low wages are the norm for almost all Burger King restaurant employees in the United States.

40.     The No-Poach Clause to which Burger King required all of its franchises to agree and abide is a major reason why Burger King wages were and are so low for Burger King restaurant employees nationwide, in addition to typically few or no benefits, poor working conditions, and

---

[8] Mona Chalabi, *What do McDonald's Workers Really Make Per Hour?*, FIVETHIRTYEIGHT (May 22, 2014), https://fivethirtyeight.com/features/what-do-mcdonalds-workers-really-make-per-hour/.

[9] Hyun Namkoong, *Fast-Food Workers Struggle to Pay for Health Insurance and Other Basics*, NORTH      CAROLINA      HEALTH      NEWS      (December      5,      2014), https://www.northcarolinahealthnews.org/2014/12/05/fast-food-workers-struggle-to-pay-for-health-insurance-and-other-basics/

[10] *Id*.

[11] Liz Alderman and Steven Greenhouse, *Living Wages, Rarity for U.S. Fast-Food Workers, Served Up      in      Denmark*,      NEW      YORK      TIMES      (October      28,      2014), https://www.nytimes.com/2014/10/28/business/international/living-wages-served-in-denmark-fast-food-restaurants.html.

[12] *Burger King Salaries in the United States*, INDEED.COM, https://www.indeed.com/cmp/Burger-King/salaries (last visited October 14, 2018).

11

restricted job choice and job mobility.

41.    The No-Poach Clause prevented franchises from competing for employees, greatly reduced employees' ability to seek better jobs at other franchises, reduced turnover, and increased franchises' bargaining power relative to their employees, who could not use offers or solicitations from other franchises to negotiate wage, benefit, or other improvements from their current employers.

42.    This resulted in lower wages for employees, higher profits for franchises, and reduced turnover.  Additionally, as franchises became more profitable, that encouraged further sales of franchises, which increased Burger King's profits from sales royalties, property rents, and franchise fees.

43.    Fast-food employees' skills, training, and work experience obtained at one fast-food chain is typically chain-specific and is not valued by other fast-food chains and other types of restaurants.  Burger King and other fast-food chains normally require their franchises to use company-mandated computer systems and working procedures, so that experience with one company is not given credit by other companies with their own computer systems and working procedures. This means that an employee of one fast-food company who leaves for a different chain would often be required to start at an entry-level regardless of how much experience she had at the first company.

44.    If the labor market for Burger King employees was competitive, Burger King franchises would compete with each other for employees by recruiting and giving offers to employees of other Burger King franchises.  Greater competition between employers, and greater transparency with respect to the pay, benefits, and working conditions of alternative jobs would lead to increased compensation, more benefits, and improved working conditions for employees.

45.    Burger King prevented this situation from becoming the reality for Burger King restaurant employees.  From at least 2010 through at least August 12, 2018, the No-Poach Clause

was part of Burger King's franchise agreement and all franchises were subject to it. As mentioned above, the No-Poach Clause read as follows:

> Neither BKC nor Franchisee will attempt, directly or indirectly, to entice or induce, or attempt to entice or induce any employee of the other or of another Franchisee of BKC to leave such employment, or employ such employee within six (6) months after his or her termination of employment with such employer, except with the prior written consent of such employer.

46.     The No-Poach Clause effectively prevents individual Burger King franchises from competing for employees, including the most experienced employees, the best performing employees, or employees who would be offered a promotion at a different restaurant, or a new or expanding restaurant from seeking employees of poor performing restaurants.  Any of those scenarios would often lead to rising wages as one franchise would be seeking to recruit the employees in those categories, and their current employer franchise would raise their wages in an attempt to keep them.

47.     Individual Burger King franchises are required to abide by the franchise agreement, and can be terminated if they violate it, including the No-Poach Clause.

48.     The Burger King employment application includes a question "Have you ever previously worked at a Burger King?"  This question helps Burger King and its franchises enforce the No-Poach Clause.

49.     Burger King's website contains an extensive section on career opportunities.[13] However, it never mentions the No-Poach Clause, or the negative effect that the No-Poach Clause has on Burger King restaurant employees' wages, benefits, and opportunities.

50.     The No-Poach Clause and similar agreements reduce competition for employees, which has the resulting effect of reducing those employees' wages, benefits, and job mobility, and

---

[13] *Job Opportunities*, BURGER KING, https://www.bk.com/careers/opportunities (last visited October 14, 2018).

reducing turnover for the benefit of franchise owners and Defendants.  This reduces employees' bargaining power both with their current employers and with other potential employers subject to the same No-Poach Clause.  In the fast-food industry, an employee's skills are usually employer-specific, and do not easily transfer to other fast-food franchises or other types of restaurants, making the No-Poach Clause and similar agreements especially harmful to employees in that industry.

51.    The purposes of the No-Poach Clause are to reduce turnover and suppress Burger King restaurant employees' wages by eliminating competition between Burger King franchises for workers.  Without a No-Poach Clause, franchises would raise wages to attract each other's workers, a franchise would have to raise wages and improve conditions to keep its own workers from seeking to work for other franchises, and a worker at one franchise could seek higher-paid or higher-level positions that at other franchises in her area.  The No-Poach Clause greatly reduced or eliminated all of those possibilities and resulted in reducing turnover, employees' wages, benefits, working conditions, job mobility, and job choice versus what they would have been in an open market – to the benefit of franchises, and by extension, Burger King, and to the detriment of Burger King employees.

52.    The No-Poach Clause prevents Burger King franchises from competing for employees and eliminates this wage competition and other competition between franchises.  Since Burger King franchises can't hire other franchises' employees, and since Burger King employees can't easily use their skills, training, and experience to receive comparable value with another fast-food chain or other restaurant, Burger King franchisees can suppress employee wages, benefits, and working conditions without increasing turnover, and Burger King employees are denied the better wages, benefits, and working conditions that open competition would create.

53.     Economists Alan Krueger and Orley Ashenfelter describe the impact of the No-Poach Clause and similar clauses as "equivalent to a reduction in the elasticity of labor supply faced by individual franchisees and, in the usual models of monopsony (or oligopsony), reduces the wage relative to the marginal product of labor."[14]  Effectively, the No-Poach Clause and similar agreements result in reduced turnover, lower wages and worse conditions for employees, and greater profits for employers—the franchises, and by extension, Burger King.

54.     Even Burger King restaurant employees who did not seek employment at other Burger King restaurants were harmed by the No-Poach Clause, because greater competition leads to better wages and benefits for workers in a given labor market generally, and franchises would raise wages for their existing workers if they risked losing them to other franchises.

55.     A New York Times article found that fast-food workers earn on average only one-third of what the average private-sector worker earns, and stated that no-poach clauses "keep employees tied to one spot, unable to switch jobs or negotiate higher pay."[15] The article also stated that "[a] lack of worker mobility has long been viewed as contributing to wage stagnation because switching jobs is one of the most reliable ways to get a raise."[16]

56.     Krueger was quoted in the article.  He studied agreements for 40 fast-food chains, and then concluded that no-poach clauses exist mainly to limit both competition and turnover, which can keep labor costs low and that they "have the potential to restrict competition and significantly influence pay."[17]

---

[14] Alan B. Krueger and Orley Ashenfelter, *Theory and Evidence on Employer Collusion in the Franchise Sector*, NATIONAL BUREAU OF ECONOMIC RESEARCH (July 2018), at 9.
[15] Rachel Abrams, *Why Aren't Paychecks Growing? A Burger-Joint Clause Offers a Clue*, NEW YORK TIMES (Sept. 27, 2017), https://www.nytimes.com/2017/09/27/business/pay-growth-fast-food-hiring.html.
[16] Id.
[17] Id.

15

57.     *Antitrust Guidance for Human Resource Professionals* states that "[n]aked wage-fixing or no-poaching agreements among employers, whether entered into directly or through a third-party intermediary, are *per se* illegal under the antitrust laws,"[18] and because "firms that compete to hire or retain employees are competitors in the employment marketplace…[i]t is unlawful for competitors to expressly or implicitly agree not to compete with one another, even if they are motivated by a desire to reduce costs."[19]

58.     The Department of Justice recently issued a statement about no-poaching agreements, stating that its "Antitrust Division continues to investigate and prosecute 'no-poach' and wage-fixing agreements" and "[w]hen companies agree not to hire or recruit one another's employees, they are agreeing not to compete for those employees' labor. The same rules apply when employers compete for talent in labor markets as when they compete to sell goods and services. After all, workers, like consumers, are entitled to the benefits of a competitive market."[20]

59.     The Department of Justice also stated that "[r]obbing employees of labor market competition deprives them of job opportunities, information, and the ability to use competing offers to negotiate better terms of employment."[21]

60.     The Department of Justice made clear that "naked" no-poach agreements are illegal, defining a naked agreement as one "not reasonably necessary to any separate, legitimate business

---

[18] U.S. DEPT. OF JUSTICE, *Antitrust Guidance for Human Resource Professionals* (Oct. 2016), https://www.justice.gov/atr/file/903511/download, at 3.
[19] *Id*, at 2.
[20] U.S. DEPT. OF JUSTICE, *See No More No-Poach: The Antitrust Division Continues to Investigate and Prosecute 'No-Poach' and Wage-Fixing Agreements* (April 10, 2018), https://www.justice.gov/atr/division-operations/division-update-spring-2018/antitrust-division-continues-investigate-and-prosecute-no-poach-and-wage-fixing-agreements.
[21] *Id*.

collaboration between the employers" and "[n]aked no-poach and wage-fixing agreements are *per se* unlawful because they eliminate competition in the same irredeemable way as agreements to fix product prices or allocate customers."[22]

61.     The Department of Justice reached a settlement with rail industry companies that had entered into no-poach agreements.[23]

62.     In January 2018, the Washington Attorney General's office began investigating fast-food no-poach agreements, including Burger King's No-Poach Clause.  Other state attorneys general later joined the investigation.

63.     In July 2018, Reuters reported on the investigation by the state attorneys general, that Burger King was one of the companies being investigated, and that the allegation was that fast-food companies were "using 'no-poach' rules in franchise agreements to hold down wages and limit employee advancement,"[24] and "[b]y limiting potential job opportunities, [no-poach] agreements may restrict employees' ability to improve their earning potential and the economic security of their families."[25]

64.     Multiple state attorneys general wrote official letters to the corporate offices of many fast-food chains, Burger King among them, seeking more information about the no-poach provisions, and stating that no-poach agreements "limit[] potential job opportunities," "restrict employees' ability to improve their earning potential and the economic security of their families," and "deprive

---

[22] *Id.*

[23] U.S. DEPT. OF JUSTICE, *Justice Department Requires Knorr and Wabtec to Terminate Unlawful Agreements Not to Compete for Employees* (Apr. 3,2018), https://www.justice.gov/opa/pr/justice-department-requires-knorr-and-wabtec-terminate- unlawful-agreements-not-compete.

[24] Diane Bartz & Alana Wise, *U.S. states probe fast-food franchise deals not to poach workers*, REUTERS (July 9, 2018), https://www.reuters.com/article/us-usa-restaurants-probe/u-s- states-probe-fast-food-franchise-deals-not-to-poach-workers-idUSKBN1JZ2NX.

[25] *Id.*

other franchisees of the opportunity to benefit from the skills of workers" covered by such agreements.[26]

65.     In July 2018, fast-food chains Arby's, Auntie Anne's, Buffalo Wild Wings, Carl's Jr., Cinnabon, Jimmy John's, and McDonalds entered into an agreement with the Washington Attorney General in which they agreed to cease using no-poach clauses in their franchise agreements. Massachusetts Attorney General Maura Healy issued a statement that no-poach agreements "unfairly limit the freedom of fast-food and other low-wage workers to seek promotions and earn a better living."[27]

66.     On or around August 12, 2018, the Washington Attorney General's office entered into an Assurance of Discontinuance with BKC under which BKC agreed that it would not include the No-Poach Clause in franchise agreements with new franchisees, it will not enforce the No-Poach Clause against any existing franchise, and it will not include the No-Poach Clause in franchise agreements with existing franchisees that are renewed.[28]

67.     The Washington Attorney General's office considered the No-Poach Clause and similar clauses imposed by other fast-food and restaurant chains on their own workers to be illegal and a violation of Washington's antitrust laws, stating: "[n]o-poach provisions create a rigged system where businesses no longer have to compete for workers, putting downward pressure on wages nationwide.  That's wrong—and illegal."[29]

---

[26] Letter from Cynthia Mark, Chief, Fair Labor Div. Mass. Office of the Attorney General, *et al.*, https://www.attorneygeneral.gov/wp-content/uploads/2018/07/2018-07-09-NPNH_Letter_Redacted.pdf (last visited Oct. 1, 2018).
[27] Jackie Wattles, *7 fast-food chains agree to end 'no-poach' rules*, CNN MONEY (July 12, 2018), https://money.cnn.com/2018/07/12/news/companies/no-poach-fast-food-industry-wages- attorneys-general/index.html.
[28] Burger King Corporation Assurance of Discontinuation, *In re: Franchise No Poaching Provisions*, No. 18-2-22877-8SEA (Wash. Super. Ct. Sept. 13, 2018).
[29] WASHINGTON STATE OFFICE OF THE ATTORNEY GENERAL, *AG Ferguson Secures End*

68.     The Washington Attorney General's office press release described how no-poach clauses hurt workers: "[b]ecause employees cannot move to another location within their corporate brand, their current location has less incentive to give them raises," and "economists believe that 'no-poach' clauses reduce opportunities for low-wage workers and stagnate wages."[30]

69.     As part of BKC's settlement with the Washington Attorney General, it agreed to send a letter to its franchisees in Washington amending its franchise agreement to remove the No-Poach Clause.[31]

## VI.     RELEVANT MARKET.

70.     Plaintiff maintains that Burger King's anticompetitive conduct is a *per se* violation of the Sherman Act, 15 U.S.C. § 1, and therefore Plaintiff is not required to define a relevant market.

71.     In the alternative, Plaintiff maintains that an observer with even a rudimentary understanding of economics would conclude that the No-Poach Clause would have an anticompetitive effect on the labor market for Burger King restaurant employees, because if the franchises who are the competitors in that labor market agree not to hire each other's employees, the wages for those employees will be suppressed versus what they would have been in an open market.  Therefore, if Burger King's conduct is deemed not to be a *per se* violation of the Sherman Act, a "quick look" analysis would apply, and Plaintiff would not be required to define a relevant market.

72.     To the extent Plaintiff's claims require the definition of a relevant economic market, the relevant market is the employment market for employees of Burger King restaurants in the United States.

---

*to No-Poach Provisions at Eight More Restaurant Chains Nationwide*, Sept. 13, 2018, https://www.atg.wa.gov/news/news-releases/ag-ferguson-secures-end-no-poach-provisions-eight-more-restaurant-chains.
[30] *Id.*
[31] See Burger King Corporation Assurance of Discontinuation, *supra* note 27.

73.     To the extent Plaintiff's claims require the definition of a relevant geographic market, the relevant market is the United States.

74.     Burger King and its franchises, all of whom were subject to the No-Poach Clause until at least August 12, 2018, have a market share of 100% for the employment of Burger King restaurant employees in the United States.  There were no opportunities for a Burger King restaurant employee in the United States to work for a Burger King restaurant that was not subject to the No-Poach Clause.

75.     Fast-food employees' skills, training, and work experience obtained at one fast-food chain is typically not valued by other fast-food chains and other types of restaurants.  Burger King and other fast-food chains normally require their franchisees to use company-specific computer systems and working procedures.  Experience with one fast-food chain is not credited by other chains, which have their own computer systems and work procedures, and an employee of one fast-food chain who leaves for another chain would often be required to start at an entry-level regardless of how much experience she had at the first chain.  Therefore, employment at other fast-food chains and other types of restaurants is not an acceptable substitute for employment at Burger King.

## VII.     ANTITRUST INJURY.

76.     Plaintiff and members of the Class are current or former Burger King employees.

77.     Burger King franchises are engaged in competition with other Burger King franchises and BKC's directly-owned franchises for Burger King restaurant employees.

78.     Burger King and its franchisees were co-conspirators in enforcing the No-Poach Clause, and they acted to support that conspiracy when Burger King imposed the No-Poach Clause on its franchises and took steps to enforce it against franchises that violated it, and when franchises agreed not to solicit or hire the current or former employees of other franchises.

79.     Burger King and its franchises intended to restrain and did in fact restrain competition

20

in the employment market for Burger King restaurant employees by entering into the No-Poach Clause, for the intended purposes of reducing turnover and wage and non-wage competition between franchises, thereby suppressing employee wages, benefits, and job choice, making franchises more profitable, and by extension, making Burger King more profitable.

80.     Burger King's anticompetitive actions had a significant impact on interstate commerce in the employment market for Burger King restaurant employees.  Burger King's actions had national impact on that market, including in metropolitan areas that cross state lines.

81.     The No-Poach Clause deprived employees of access to the higher wages, better benefits and working conditions, and greater job choice and mobility that free and open competition would have created for them.  This affected not only employees who sought positions at other Burger King franchises, but also affected employees who did not seek other positions, because a franchise faced with competition for its own workers would often raise their wages and improve their benefits and working conditions to encourage them to stay.

82.     Therefore, Burger King's anticompetitive actions had the proximate and foreseeable result of injuring the wages of Plaintiff and other members of the Class.

83.     If not for Burger King's anticompetitive actions through its use of and enforcement of the No-Poach Clause, Plaintiff and other members of the Class would have received higher wages, better benefits and working conditions, and greater job choice and mobility.

84.     The suppression of wages and other non-wage benefits and job mobility that Plaintiff and other Class members sustained is the type of injury that the antitrust laws were intended to prevent and make illegal, and it was the direct result of Burger King's anticompetitive actions through imposing and enforcing the No-Poach Clause on its franchises.

85.     Burger King's' anticompetitive actions had no legitimate business justification and

21

did not have any pro-competitive benefits.

86.    Burger King is jointly and severally liable for the acts of non-Defendant co-conspirator franchises and their owners.

87.    Burger King therefore caused antitrust injury to Plaintiff and other members of the Class.

## VIII.   FRAUDULENT CONCEALMENT AND STATUTE OF LIMITATIONS.

88.    Burger King concealed the conspiracy from Plaintiff and other members of the Class. The No-Poach Clause was not disclosed to Plaintiff or other Burger King employees, and they could not have reasonably discovered it.

89.    Plaintiff and other members of the Class did not have access to information that would have alerted them to the possibility of the conspiracy between Burger King and its franchises.

90.    Burger King franchises represented to their employees that they were in compliance with the law and that the wages being offered were determined fairly through competition in a free and open market.  Plaintiff and other members of the Class could not have reasonably determined that this was false based on information available to them, especially in light of Burger King's and its franchises' efforts to conceal their anticompetitive actions from franchise employees and members of the public.

91.    When a Burger King employee applied for a job at another Burger King franchise, that employee would simply not receive a job offer.  The employee was not informed that the No-Poach Clause was preventing her from getting that other position.

92.    Burger King and its franchises intended to, and did in fact, conceal evidence of the No-Poach Clause and its effects in suppressing wage and non-wage competition from Burger King restaurant employees.

93.     Plaintiff and other members of the Class relied, reasonably, on statements by Burger King and its franchises that they were in compliance with the law, and that the wages being offered were determined in a free and open market.

94.     In light of the above, Burger King's knowing and active efforts to conceal the conspiracy and the conduct behind it should be deemed to toll any statute of limitations herein, and to estop Defendants from using any statute of limitations defense in this action.

## IX.     CLASS ACTION ALLEGATIONS.

95.     Plaintiff brings this action on behalf of herself and all others similarly situated pursuant to Fed. R. Civ. P. 23 as representative of a Class defined as follows:

> All persons in the United States who worked for a Burger King restaurant at any time from January 1, 2010 onwards until such time as the anticompetitive conduct alleged herein has ceased (the "Class Period.")

> Excluded from the Class are Defendants' officers and directors, Burger King franchise owners, any employees of any Defendant who worked for that Defendant in a capacity other than as a restaurant employee of a Burger King restaurant directly-owned by a Defendant or its subsidiary, Defendants' counsel, and employees of the U.S. District Court for the Southern District of Florida, and all immediate family members of any of those excluded individuals.

96.     Plaintiff reserves the right to amend the Class definition and to add subclasses.

97.     The number of members of the Class is so large and numerous as to make joinder of all potential Class members impracticable.  There are approximately seven thousand Burger King restaurants in the United States, and each one would likely have at least ten current employees and many more former employees, meaning that there are at least tens of thousands of proposed members of the Class throughout the United States.

98.     There are numerous questions of law and fact that are common to the Class and that predominate over any issues affecting individual members of the Class, including, *inter alia*:

A. Whether Burger King imposed the No-Poach Clause on its franchises;

B. Whether Burger King enforced the No-Poach Clause on its franchises who sought to hire or solicit employees of other franchises;

C. When Burger King first included the No-Poach Clause in its franchise agreements;

D. How the No-Poach Clause was enforced;

E. Whether, and by how much, the conduct alleged herein suppressed the wages, benefits, working conditions, and job mobility of Burger King employees;

F. Whether Burger King and its franchises intended to suppress the wages, benefits, working conditions, and job mobility of Burger King employees through the No-Poach Clause;

G. What effect the No-Poach Clause had on Defendants' and their franchises' profits;

H. Whether the No-Poach Clause and its enforcement had a legitimate pro-competitive justification;

I. Whether, if the No-Poach Clause and its enforcement had a legitimate pro-competitive justification, there was a less restrictive means of achieving that objective;

J. Whether the conduct alleged herein was a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

K. Whether the conduct alleged herein was an unreasonable restraint of trade;

L. Whether the conduct alleged herein was a *per se* violation of the federal antitrust laws;

M. Whether the conduct alleged herein constituted a violation of the "rule of reason" under the federal antitrust laws;

N. The operative time period and extent of Defendants' violations;

O. Whether Burger King and its franchises fraudulently concealed their conduct;

P. Whether Plaintiff and the Class could reasonably have known about the no-poach conspiracy prior to its public announcement;

Q. Whether RBI and BKW knew about BKC's imposition of and enforcement of the No-Poach Clause on its franchises and if so, whether they authorized it or took any steps to prevent it;

R. The proper measure of damages for the Class; and

S. The appropriate injunctive and equitable relief for the Class.

99.     Plaintiff's interests are typical of, and not antagonistic to, those of other or absent members of the Class, such that she can fairly and adequately represent their interests.

100.     Plaintiff has retained counsel with substantial experience litigating complex antitrust class actions, including substantial experience litigating such cases within this District.

101.     Class treatment of Plaintiff's federal antitrust claims is a superior method for the fair and efficient adjudication of this controversy in that, among other things, such treatment will permit a large number of similarly-situated persons to prosecute common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender.

102.     Plaintiff knows of no difficulty likely to be encountered in the maintenance of this action as a class action under Fed. R. Civ. P. 23.

## COUNT ONE

### Violation of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1)

103.     Plaintiff repeats and reiterates each of the allegations set forth in paragraphs 1-102 as if fully set forth herein.

104.     Since the conduct alleged herein is *per se* illegal or evaluated under the "quick look" analysis, Plaintiff is not required to define a relevant market.

105.     In the alternative, if Plaintiff is required to define a relevant market, the relevant

economic market is the employment market for employees of Burger King restaurants in the United States, and the relevant geographic market is the United States.

106.     Burger King imposed the No-Poach Clause on its franchises, and then enforced the No-Poach Clause on them, in collusion with them, thereby restricting competition in the labor market for Burger King restaurant employees at their detriment, suppressing their wages, benefits, working conditions, and job mobility.

107.     This collusion between Burger King and its franchises was an unreasonable restraint of trade and violated federal antitrust law.

108.     Burger King's imposition and enforcement of the No-Poach Clause was intended to, and did in fact, suppress wage and non-wage competition, turnover, and job mobility for Burger King restaurant employees, resulting in Burger King restaurant employees having artificially low wages, worse benefits and working conditions, and reduced job mobility and job choice.

109.     Burger King and its franchises engaged in this collusion in order to increase the profits of Burger King and its franchises, and they did in fact increase their profits through reducing turnover, suppressing wages and wage growth, providing worse benefits and working conditions, and being able to exploit workers whose mobility within the company was greatly reduced or eliminated.

110.     The direct, foreseeable, intended, and proximate result of Burger King's actions was the suppression of wages, benefits, working conditions, and job mobility for Burger King's restaurant employees.

111.     There is no legitimate pro-competitive justification for Burger King's actions, and even if there was, there would be a less restrictive alternative way to achieve it.

112.     As a direct, material, and proximate result of Defendants' violation of § 1 of the Sherman Act, Plaintiff and the Class have suffered injury to their business and property within the

26

meaning of § 4 of the Clayton Act throughout the Class Period.

113.    Plaintiff and the Class seek treble damages for Defendants' violations of § 1 of the Sherman Act under § 4 of the Clayton Act.

114.    Plaintiff and the Class also seek an injunction against Defendants, preventing and restraining the violations alleged above, under § 16 of the Clayton Act.

**WHEREFORE, Plaintiff hereby respectfully requests:**

A. That the Court determine that Plaintiff's claim alleged herein is suitable for class treatment, and certify the proposed Class pursuant to Fed. R. Civ. P. 23;

B. That the Court appoint Plaintiff as the representative of the Class;

C. That Plaintiff's counsel be appointed as counsel for the Class;

D. That the Court award, pursuant to 15 U.S.C. § 15, compensatory and trebled damages to Plaintiff and the Class resulting from Defendants' violations of the Sherman Act;

E. That the Court order, pursuant to 15 U.S.C. § 26, permanent injunctive relief preventing Defendants from continuing their unlawful acts in violation of the Sherman Act;

F. That Plaintiff and the Class be awarded their costs, expenses, and reasonable attorneys fees in bringing this action;

G. That Plaintiff and the Class be awarded pre-judgment and post-judgment interest on all sums awarded; and

H. Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff hereby demands a trial by jury on all issues triable to a jury in this action.

Dated: October 19, 2018

Respectfully submitted,

**PODHURST ORSECK, P.A.**

*/s/ Peter Prieto*
Peter Prieto (FBN 501492)
John Gravante (FBN 617113)
Matthew P. Weinshall (FBN 84783)
Alissa Del Riego (FBN 99742)
SunTrust International Center
One S.E. Third Ave., Suite 2300
Miami, Florida 33131
Phone: (305) 358-2800
Fax: (305) 358-2382
Email: pprieto@podhurst.com
         jgravante@podhurst.com
         mweinshall@podhurst.com
         adelriego@podhurst.com

John Radice
Daniel Rubenstein
**RADICE LAW FIRM, P.C.**
34 Sunset Blvd.
Long Beach, NJ 08008
Phone: (646) 245-8502
Fax: (609) 385-0745
Email: jradice@radicelawfirm.com
         drubenstein@radicelawfirm.com
(*Pro hac vice application forthcoming*)

Eric L. Young, Esquire
Paul V. Shehadi, Esquire
**McELDREW YOUNG, Attorneys-at-Law**
123 S. Broad Street, Suite 2250
Philadelphia, PA 19109
Phone: (215) 367-5151
Fax: (215) 367-5143
Email: eyoung@mceldrewyoung.com

28

paul@mceldrewyoung.com
(*Pro hac vice application forthcoming*)

Brett A. Datto, Esquire
**WEIR & PARTNERS LLP**
The Widener Building
1339 Chestnut Street, Suite 500
Philadelphia, PA 19107
Phone: (215) 665-8181
Fax: (215) 665-8464
Email: brett.datto@weirpartners.com
(*Pro hac vice application forthcoming*)

*Attorneys for Plaintiff Monique Michel and  the
proposed Class*